## No. 12,386.

## SUCCESSION OF FANNY MINERVA SEYMOUR, WIDOW OF WILLIAM R. MILLS, DECEASED.

### SYLLABUS.

The succession of Fannie Minerva Seymour, widow of William Reed Mills, was opened by her death in New Orleans, on the 6th of January, 1896; and the public administrator having petitioned for the issuance of letters of administration as for a vacant succession, Charles Clinton Brown, of Sacramento, California, and Mary Brown, widow of James L. McVey, of the city of Huntington, West Virginia, filed an opposition thereto—alleging themselves to be the brother and sister of the deceased, and her sole and exclusive heirs at law, and praying judgment recognizing them to be such, and placing them in possession of her estate.

In the controversy thus raised, the Attorney General filed an appearance for the State, joining the public administrator, and claimed, that as the deceased died intestate and without heirs, she was irregular heir—alleging that the true name of the deceased was Fanny Minerva Seymour, and that she was born in London, England.

Consequently this litigation involves only the question of the identity of the deceased, and whether she was really Rachel Fanny Brown, issue of the marriage of John Jacob Brown and Rebecca Smallwood, and the sister of the opponents.

The judge of the District Court reached the conclusion that the deceased was identical with Fanny Brown, and recognized the opponents as her heirs at law and adjudged them to be placed in possession of her estate.

This court has reached the same conclusion and affirms his judgment.
solved or bend.

A PPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*M. J. Cunningham,* Attorney General; for the State, Plaintiff, Appellant.

*Chretien & Suthon,* for Public Administrator, Plaintiff, Appellant.

*Rogers & Dodds* and *Charles F. Claiborne,* for legal heirs seeking to be recognized, Appellees.

The opinion of the court was delivered by WATKINS, J.

On application for rehearing by NICHOLLS, C. J.

On rehearing by MONROE, J.

The opinion of the court was delivered by

WATKINS, J. The Succession of Fannie Minerva Seymour, widow of William Reed Mills, was opened by her death in the city of New Orleans, on the 6th of January, 1896, and J. B. Vinet, public administrator, soon after applied for letters of administration, on the theory that the deceased died intestate and without heirs, and that her succession was vacant.

Before letters were granted, Charles Clinton Brown, of Sacramento City, California, and Mary Brown, widow of James McVey, of Huntington, West Virginia, alleging themselves to be the surviving brother and sister of the deceased, and her sole surviving heirs at law —being the children of the marriage of John J. Brown and Rebecca Brown, his wife, both deceased—made claim to the property of her estate, and prayed for a judgment placing them in possession thereof, as joint owners in indivision.

The claim of the opponents is, substantially, that the maiden name of the deceased was Rachel Fanny Brown, but that she was known and frequently called, during her lifetime, Fanny Sweet, Fanny Maria Hinckley, and Fannie M. Hinckley.

The State of Louisiana, through the Attorney General, intervened in the controversy and set up claim to the property as irregular heir of the deceased, alleging that her name was Fannie Minerva Seymour, and that she was born in London, England, and died without heirs.

The prayer of her petition is, that she be recognized as the irregular heir of the deceased, and be placed in possession of the property and effects of her estate, as such.

In an amended and supplemental petition, Charles Clinton Brown and Mary Brown McVey, allege, in terms more specific and definite than those of their original opposition, "that they are the children of Rebecca Brown and John J. Brown, and issue of their marriage; that their father and mother were married in Christianburg, Montgomery county, Virginia, on or about the year 1816," etc.

The public administrator plead a general denial to the demands and oppositions of Charles Clinton Brown and Mary Brown McVay, and joined the State in the defence to their claims as legal heirs of the deceased, and in her demand to be recognized as irregular heir as well.

Consequently, the controversy involves simply the identity of the deceased, and whether she was Rachel Fanny Brown, issue of the marriage of John J. Brown and Rebecca Smallwood; or was she Fannie Minerva Seymour, or some other person than Rachel Fanny Brown—it is of no particular consequence as to what *other* person, if any, she was.

The total value of the estate is about fifty-five thousand dollars, but as none of the contestants concerning its indebtedness, or the distribution of its assets have prosecuted an appeal from the judgment of the judge *a quo,* nor joined in that of the State, no further mention need be made of same.

The testimony adduced on the trial took a wide range; and, necessarily, because the birth place and origin of the deceased were so obscure and remote, her history extending into the past more than half a century.

Upon a careful examination and analysis of the evidence, the judge

*a quo* arrived at the conclusion that the opponents, Charles Clinton Brown and Mary Brown McVey, had established their heirship, satisfactorily, and he gave judgment in their favor, recognizing them as the sole, joint, heirs of the deceased, and ordered them to be placed in possession of her estate.

In support of his judgment he assigned his reasons in writing, which have been of much assistance to us in our investigation of the case.

Thereupon, the Attorney General filed a rule for a new trial, stating the grounds upon which he relied at great length, but same, upon due consideration by the court, was denied.

Thereupon the State appealed, and the public administrator joined in her application.

Soon after lodging her appeal in this court, the State, through the Attorney General, made an application to have the cause remanded, "on the ground that since the (original) trial evidence has been discovered * * which would necessarily produce a different result in any court." He further shows, that in the nature of the case, it was not practicable, by any reasonable diligence, to ascertain the *facts upon which this motion is based,* until the case of the claimants was exposed by the evidence adduced upon the trial," etc.

The motion then sets out in detail the names of the witnesses, and the character of the evidence it is expected to obtain from them, and thereto are annexed quite a number and variety of exhibits in support of the application.

From the nature and character of the application, it is evident that we should postpone the consideration of this motion until we have made an examination of the evidence which the transcript contains; for if we should reach the conclusion that the judgment rendered in the court below should not be affirmed, an examination thereof will not be necessary.

Nevertheless, the fair inference to be deduced from the application to remand is, that the case, as it stands upon the evidence in the record, is with the opponents; and that if our opinion is to be guided and controlled thereby, the judgment appealed from would, in all likelihood, be affirmed.

The question for decision is whether the judge *a quo* correctly decided that the maiden name of the deceased was Rachel Fanny Brown, daughter of John J. Brown and Rebecca Smallwood, his wife,

and not Fannie Minerva Seymour, born in London, England, as the Attorney General contends.

The question presented is one of identity, merely, which must depend largely upon circumstantial evidence, and the opinions and judgment of witnesses.

There is, however, one fact which is well established—a fact that is undenied—and that is, that the deceased was the widow of William Reed Mills, and during their married life they lived for many years in the city of New Orleans, Louisiana, where they were well and generally known, and that she resided there at the time of her husband's death, and died there on the 6th of January, 1896.

The record contains a nuncupative will in authentic form, which is shown to have been executed by the deceased in New Orleans on the 7th of August, 1895; and, also, a notarial renunciation and revocation of that will, and all others, on the 30th of November, 1895. These instruments serve to identify her and her domicile in New Orleans, immediately previous to her death.

For the purpose of accuracy, we will briefly sketch the history of the deceased as it is detailed by the district judge in his reasons for judgment, before attempting an analysis of our own, of the evidence of the witnesses; and for the purpose of greater accuracy we have made and reproduced the following extracts therefrom, viz:

"This litigation involves the identity of the deceased. It can only be solved by examination and study of a mass of conflicting testimony, and weighing the evidence in the scales of justice.

"The facts clearly proved by legal evidence, are thus stated:

"John Jacob Brown married Rebecca Smallwood on the 26th day of December, 1814, in Virginia. They moved to and lived on a farm in the Quaker Bottom, Rome Township, Lawrence County, Ohio. There were born five children, James Brown, Mary Brown, Sarah Henrietta Brown, Rachel Fanny Brown and Chas. Clinton Brown. They all grew up and attended school in Lawrence county.

"James Brown disappeared, and has not been heard from since 1838.

"Mary Brown married James J. McVey, and is now a widow residing in Huntington, West Virginia.

"Sarah Henrietta Brown married a man by the name of Swartoot. He died a short time after the marriage. She then went to Cincinnati about the year 1839, and married John McCormack. They lived

in Cincinnati until the spring of 1849, when they left for California. McCormack died on the way, and his widow arrived at Sacramento in 1850. She there married Charles Green. He died, and she then married one Wolson. She died in Sacramento, California, in 1870, leaving her property to her brother, Charles Clinton Brown.

"Charles Clinton Brown lived at home until he was thirteen years old. From that time, 1841, to the year 1851, he was at work on boats on the Ohio and Mississippi rivers, or engaged in cutting timber in the swamps of lower Louisiana, returning home at intervals of three months to a year. Shortly before his mother's death in 1851, he returned home and resided there permanently. In November, 1857, having married, he moved to Missouri, where he lived about fifteen years, and in 1870 he removed to Sacramento, California, where he has since resided.

"Rachel Fanny Brown was born on the 9th day of January, 1826, went to school in Lawrence County, Ohio, and lived at home. In 1841 she went to live with her sister, Mrs. McCormack, in Cincinnati. She was living in Cincinnati in 1844.

"She then disappeared and was never seen or heard of in the State of Louisiana by any one until the summer of 1857.

"There is no evidence in the record tending to show where she was between 1844 and June, 1846.

"In the month of June, 1846, a young woman, apparently about nineteen years of age, who stated her name was Fanny Minerva Seymour, shipped from Liverpool, England, for New York on the ship Waterloo, commanded by Captain Allen. From New York she came to this city, arriving here in the latter part of the summer, or early in the fall, of 1846.

"In January, 1847, she appeared at the old Globe ball-room as Fanny M. Smith, taking the surname of a man she stated she came with from New York, and had married. Smith died on the 27th day of December, 1847. The undertaker sued Fanny M. Smith in the First District Court of New Orleans for $80, for the funeral expenses of her deceased husband. During the years 1847, 1848, and up to the spring of the year 1849, she lived in this city, pursued the calling and was notoriously known as a prostitute. In the spring of 1849 she left this city for California by way of Panama.

"In June, 1846, to two persons, passengers on the ship Waterloo, she stated her name to be Fanny Minerva Seymour, and that she was

born in London, England. She impressed one of these gentlemen at that time as being of a better class of servants, a barmaid, clearly English, with the cockney accent, although she had lost much of the accent when he saw her in this city in 1868.

"In the year 1848 she stated to her room-mate, her intimate friend then and for many years after, that her name was Fanny Minerva Seymour; that she was born and raised in London, England; that she was of good family; that her father and mother died when she was young, and her guardian put her in a bar-room to serve. That she became acquainted with Captain Allen, and the first thing she knew, in the spring or summer of 1846, she was on board of a ship coming over to New York.

"Before she went to California, she stated to two other persons that she was born in England, and they were impressed with the belief that she was an English woman.

"Fanny Minerva Seymour, alias Fanny M. Smith, reached San Francisco in 1850, and lived there a short time in a house of ill-fame. In the same year she went to Sacramento, and became the proprietress of a place called the Palace, and the mistress of a gambler, Rube Raines, who owned a gambling saloon, the El Dorado.

"She lived in Sacramento under the name of Fanny M. Smith until December 20th, 1852. On that night she shot and wounded a man named Albert Putnam, was arrested, carried to the prison ship in the river, from which she escaped and left California.

"The Sacramento Union, which published an account of the shooting of Putnam on the 21st and 23rd of December, 1852, speaks of her as 'Fanny Seymour, alias Smith.'

"In Sacramento she met her sister, Mrs. McCormack, who was living there under an assumed name of Leah Duell. The two women stated, while together in the presence of others, that they were sisters, and they were so known and regarded in the community.

"From California Fanny Minerva Seymour, alias Fanny M. Smith, came to New Orleans, passing through Panama. On her way she passed through Acupulco, Mexico, where she spoke of her sister to a gentleman who knew them both in Sacramento. Later on, in 1853, in Panama, she inquired of the same party about her sister. She arrived here some time prior to the yellow fever epidemic of 1853. She then stated she had changed her name to Fanny Sweet and she was going back to Panama, and was there while the yellow fever was raging in

this city. From Panama she went to New York, where, on the first day of October, 1853, she married Abraham Miller Hinckley, of New York, but who was temporarily residing at Aspinwall, on the Isthmus of Panama.

"Soon after the marriage Fanny Minerva Seymour, alias Fanny M. Smith, alias Fanny Sweet, came back to the city as Mrs. A. M. Hinckley. Her husband, A. M. Hinckley, returned to Panama. She arrived here in 1854. The same year she again went to Panama, and returned to this city. She then lived in a house on Terpsichore street, near Coliseum Square. She was then known as Mrs. Fanny M. Hinckley, and as Fanny M. Sweet.

"In June, 1855, Fanny M. Hinckley was in New York, where she remained until the 15th day of December, 1856. On the 1st day of February, 1856, she instituted a suit against her husband for a divorce. The suit is entitled 'Fanny Maria Hinckley, by David C. Ringland, her next friend, against Abraham Miller Hinckley.' On December 15, 1856, a judgment of divorce was granted. No certificate of marriage showing by what name she was married to Hinckley has been produced, nor is her maiden name disclosed in the divorce proceedings.

"The petition is signed Fanny Maria Hinckley.

"From New York she went to Havana, and was there in February, 1857.

"From Havana she came to this city in June, 1857, and boarded on Rampart street, between Gravier and Perdido, where she was visited by a gentleman who she stated was the captain of the vessel that brought her from Havana.

"In the summer of 1857, Mrs. Fanny M. Hinckley went to Lawrence County, Ohio. She was at once recognized by Charles Clinton Brown and by Mrs. Mary McVey as their sister, Rachel Fanny Brown. She was also recognized by Henry C. Neff, Jane M. Neff, C. Gillett and Ammon McLaughlin, who had known her as Fanny Rachel Brown, in Lawrence County, had gone to school and associated with her in early days. She stayed in the old home where she was born with her sister, Mrs. McVey, until she quarrelled with her sister's husband, James McVey.

"In August, 1857, she removed the remains of her mother, Rebecca Brown, by second marriage Rebecca White, from Rome Churchyard,

in Lawrence County, to the old home place, where her mother had lived and her children had been born, then owned by Charles Clinton Brown. Over her grave she erected a marble shaft, upon which was inscribed her mother's name, age, date of death, and ten lines of intended poetry, conveying the idea that she had returned to view and scatter flowers over her mother's grave.

"On the 15th day of August, 1857, Chas. Clinton Brown sold to Mrs. Rachel Fanny Maria Hinckley the ground in which her mother was buried.

"On the 15th day of September, 1857, Charles Clinton Brown and his wife, F. E. Brown, executed a common law deed of sale to Rachel Fanny Maria Hinckley of the ground in which her mother was buried, and the deed was delivered to her lawyer, John S. George, and recorded in the recorder's office in Lawrence County, on the 30th day of October, 1857.

"On September 12th 1857, she prosecuted James McVey for criminal libel. The suit is entitled, 'State of Ohio vs. James McVey,' and was instituted before Peras R. Polley, justice of the peace in Lawrence County. The suit is based upon a letter, alleged to have been written by James McVey, although signed by 'Judge Lynch,' in which she is notified that the citizens would no longer allow their peace and quiet to be disturbed by the passions and avarice of such an outrageous female monster, and notifies her to leave the place, or expect a 'suit of tar and feathers and a free pass down the river on a slab.'

"On her affidavit, signed and sworn to as R. F. M. Hinckley, McVey was arrested and gave bond. The case was continued on September 14, 1857, on account of the absence of one of the witnesses, Charles Clinton Brown, and was tried on the 17th day of September, 1857.

"R. F. M. Hinckley, Abraham Lacy, Richard Bowen and Wallace Lewis were sworn and examined on behalf of the State, and L. E. Conegar for the defense. Judgment was then rendered for the defense, and the prosecuting witness, R. F. M. Hinckley, condemned to pay the costs, $6, which she did. In this litigation she was represented by her attorney, John S. George, and the defense by W. W. Johnson.

"At the same time she instituted another suit against James McVey, through her attorney, John S. George. She left Lawrence County between September 18th and 20th, 1857, and wrote two letters, dated

December 17, 1857, and February 20, 1858, to John S. George, in answer to some letters from him in reference to this suit.

"During the greater part of the year 1858, and during 1859, 1860, and to July, 1861, she remained in this city, known as Mrs. Fanny M. Hinckley and Fanny Sweet.

"In July, 1861, a man, named Willis G. Stevens, obtained a contract from the Confederate government to go abroad and purchase gunpowder. He associated with him a highly respected citizen of this city. To him he introduced, as their partner in the enterprise, Mrs. Fanny M. Hinckley, disguised as a man, as his nephew, Fred. Sweet. They traveled by land to Houston, Texas, where, to this gentleman's horror and dismay, her sex, until then unknown to him, was discovered. They then proceeded to Brownsville, Texas, where Stevens was taken dangerously ill, and soon died. She then returned to the city and was accused of murdering Stevens.

"In 1863 she filed an opposition in the succession of Stevens, claiming that the succession was indebted to her on an English bill of exchange, and on his note given to her by Stevens while in Texas. She gained her suit, and recovered from the succession $3255.55.

"From 1862, to the time of her death, she remained in this city.

"From 1852 to 1896, at various times, to eleven persons whom she knew socially and professionally, four of whom were her lawyers, she declared positively that her name was Fanny Minerva Seymour, and that she was born in London.

"On the 9th day of August, 1879, Mrs. F. M. Hinckley was married in a Catholic church to William Reed Mills. She signed the marriage certificate Fanny Minerva Seymour, widow of A. M. Hinckley. They lived in this city as husband and wife, and were so known until Mills died.

"On July 21st, 1891, William Reed Mills died, and his last will, dated October 8th, 1887, was probated. In his will he left one-half of his property to his beloved wife, Fanny Minerva Seymour, widow of Hinckley, and appointed her one of his executors.

"Before his death, on the 17th day of August, 1882, he transferred to his wife, Fanny M. Seymour, widow of A. M. Hinckley, certain property in Pensacola, Fla.

"In 1860 Mrs. A. M. Hinckley purchased four pieces of property, by four acts of sale, of different dates; in 1862, 1866 and 1868, three pieces of property, by three acts of sale, and in all of them her name

is stated to be 'Fanny Minerva Seymour, widow of A. M. Hinckley, from whom she was divorced.'

"On January 20th, 1883, she sold a piece of property, and in the act of sale her name is stated to be Fanny Minerva Seymour, wife of William Reed Mills, and is signed Fanny M. Mills.

"On the 25th of July, 1870, she made her will before Gustave LeGardeur, Jr., a notary public in this city, in which she declared, 'My name is Fanny Minerva Seymour, the divorced wife of Abraham Miller Hinckley. I have neither ascendants nor descendants.'

"On the 3rd day of July, 1895, she made her second will, before Joseph D. Taylor, a notary public, in which she declared, 'My name is Fanny Minerva Seymour, widow by first marriage of Abraham Miller Hinckley, deceased, and by second marriage of William Reed Mills, deceased. I am a native of London, England. I was born on the 9th day of January, 1826. I have no forced heirs.'

"On the 7th day of August, 1895, she made her third will, before Frank Zengel, a notary public, in which she said: 'My name is Fanny Minerva Seymour, widow by first marriage of Abraham Miller Hinckley, and widow by second marriage of William Reed Mills. I am a native of London, England. I was born on the 9th day of January, 1826. I have no living relatives, and, consequently, no heirs of any kind.'

"On the 30th day of November, 1895, by an act of revocation, before Robert P. Upton, a notary public, in which her name is stated to be 'Fanny Minerva Seymour, widow by first marriage of Abraham Miller Hinckley, and widow by second marriage of William R. Mills, she revoked all wills heretofore made.

"Prior to this revocation, the day before, she stated to Mr. Upton that the was born in England, and had no relatives. After the revocation, on the 29th or 30th of December, 1895, she sent for Mr. Upton, and he told her that she 'ought to make another will, because if anything happened to her in her present condition, what she left would go to the State,' and she replied to him that 'under all the circumstances she did not know but that was the best disposition to make.'

"The greater part of this estate, inventoried at $54,765.60, was acquired by her in 1892 from the succession of William Reed Mills, being a part of his fee in the succession of Myra Clark Gaines.

"About 1892 her health began to fail. She then became addicted to the opium habit. In 1893 she became blind, miserly, suspicious, liv-

ing in constant fear that some one would rob her, and finally died, on
the 6th day of January, 1896, really of starvation, although possessed
of ample means.

"These facts show that the deceased stated, orally, to various per-
sons, at different times and places, during fifty years of her life, that
her name was Fanny Minerva Seymour; that she was born in London,
England, and she had no relations.   They are nothing more than her
bare statments, made not even under the sanctity of an oath.   They
are the statements of a deceased person, and, although they are con-
sidered evidence, they are considered as evidence of the weakest char-
acter.   They are entitled to weight only according to the character of
the person by whom, the occasion when, and the circumstances under
which they are made.   They can be contradicted by positive proof,
notwithstanding they have been frequently made during many years.
Stevens, on Evidence, p. 77.

"These facts show that the deceased made the same statements in
various acts of sale, in wills and in an act of marriage.   Declarations
as to name and domicile in notarial acts, and documents, are evi-
dence, subject to consideration in connection with other facts.   They
are not conclusive upon the parties making them, nor upon those not
parties to the acts.   They can be controverted by positive proof.   40
Ann., 378; 10 Ann., 268; 5 Ann., 348. Declarations in wills are subject
to the same rules as other notarial acts.   They are not considered sol-
emn dying declarations.   Dying declarations are entirely different,
made under different circumstances, and are known only in criminal
cases, never in civil cases.   Greenleaf, on Evidence, Sec. 155.

"These facts show the impression entertained by those with whom
she was thrown in contact, as to her nationality.   They can be con-
troverted, and it can be shown by positive proof in this case, as in
many of the affairs of life, that the shrewdest of men form many
erroneous impressions of persons and things.

"The facts show where she had been, and where she had lived, dur-
ing most of her life.   They do not show why she was on a vessel on the
Atlantic in June, 1846, but from the facts disclosed, from her dis-
graceful vocation and roving disposition, the legal presumption is
that she had visited England some time between 1844 and 1846, and
was then returning.

"These facts show her notorious, bad character, and the variety of
names under which she plied her vocation.

"These facts show positively against her declarations to the contrary, and the impressions of others to the contrary, that her maiden name was Fanny Rachel Brown; that she was born on the 9th day of January, 1826, in Lawrence County, Ohio, issue of the marriage of John Jacob Brown, and his wife, Rebecca Smallwood, and that she was the sister of Charles Clinton Brown and Mrs. Mary McVey. That she disappeared in 1844, met her sister, Sarah Henrietta Brown, widow of John McCormack, then known as Leah Duell, in Sacramento, Cal., in 1850, and returned to Lawrence County, Ohio, in 1857, where she was received and recognized by her family and early friends. That she returned to Lawrence County not as an English woman, named Fanny Minerva Seymour, visiting a part of this country then little known, without an object, but as Mrs. Rachel Fanny Maria Hinckley, with the avowed purpose of removing her mother's remains from Rome Churchyard to the old family homestead. That she did so, purchased the land in which to bury her, erected a monument over her grave, then engaged in litigation with her brother-in-law, James McVey, and left never to return.

"These facts show positively against her declaration to the contrary, and the impressions of others to the contrary, that Rachel Fanny Brown, Fanny Minerva Seymour, Fanny M. Smith, Fanny Sweet, Freddy Stevens, Mrs. Rachel Fanny Maria Hinckley, Mrs. A. M. Hinckley and Mrs. William Reed Mills was the same person.

"These facts show that the deceased deliberately and persistently asserted, through fifty years, that which she knew to be false, and deliberately and persistently on every occasion when she could deceive without detection, even in the sacred precincts of a church of the Almighty God, adhered to the lie she had uttered.

"For these reasons judgment is rendered in favor of the plaintiff, Charles Clinton Brown and Mrs. Mary McVey, as prayed for; the demand of the State is rejected, and the succession of the deceased condemned to pay the costs."

The judge *a quo* has evidently studied the record well, and has made a very careful and accurate analysis of the evidence; as it has been fully verified by a thorough examination of our own.

In the motion for a new trial, which was filed by the Attorney General and the attorneys for the public administrator, the following grounds are taken, viz:

1.   That there is error in its opinion because the court attaches no weight to the declarations of the deceased as to her maiden name, and as to that of her nativity.

2.   That there is error therein because the evidence fails to show any motive on the part of the deceased to conceal her identity as Rachel Fannie Brown.

3.   That there is error therein, because the deceased declared herself to be Fanny Minerva Seymour in an authentic testament which she executed a few months prior to her death.

4.   That there is error in the conclusion of the court, that it was Fanny Rachel Brown who was a passenger on the ship Waterloo, in the early part of 1846, on her voyage from Liverpool to New York, notwithstanding she alleged her name to have been Fanny Minerva Seymour, and a native of London, England.

5.   That this conclusion of the court was erroneous, because in every subsequent act of hers, such as wills, acts of sale and the like, the deceased invariably styled herself Fannie Minerva Seymour, and a native of London, England.

6.   That the opinion is erroneous, for the reason that it gives full weight to plaintiff's testimony, the documentary evidence being connected with the deceased by the instrumentality of the parol declarations of witnesses residing in Ohio and California, friends of the plaintiffs, and can not apply to an English woman, who came to America in 1846.

That motion rests exclusively upon alleged errors of the judge in attributing greater weight to the testimony adduced by the plaintiffs than it was entitled to have received, mainly because it did not apply to an English woman, who was born in London. It does not proceed upon the theory that his opinion fails to recite the facts accurately and fully.

. The ruling of the judge upon that motion was in conformity with his written opinion.

An examination of the evidence has induced us to separate it into three categories, and collate and analyze it with reference to three different epochs, viz:

*First.*—The alleged marriage of John Jacob Brown and Rebecca Smallwood, in Montgomery County, Virginia, in 1814, and the names and ages of their children, and a sketch of their histories.

*Second.*—The life of Fanny M. Smith, in California, in 1850, and her history and career during many subsequent years.

*Third.*—The visit of Mrs. Fannie M. Hinckley to Ohio, in 1857, and the circumstances attending that visit connecting her with Fanny M. Smith, of California, and tending to identify her with the Rachel Fanny Brown who was born in Lawrence County, Ohio, in January, 1826.

Upon the evidence relating to these people and epochs, will depend the verity of the existence of such a person as Fanny Minerva Seymour, personating the deceased Mrs. Mills.

## I.

On the first proposition, the proof is clear and indubitable to the effect that John Jacob Brown and Rebecca Smallwood were married at Christianburg, in Montgomery County, Virginia, on the 26th of December, 1814, the fact being exhibited by exemplifications from the official records.

It is shown, by all the evidence, that the two opponents, Charles Clinton Brown and Mary Brown, widow of James L. McVey, are lawful issue of that marriage, the latter being the second child of that marriage, and the former the last and youngest child; and all other children thereof, and their descendents, being dead long since.

The evidence shows that, of that marriage, there were eight children of the following names, and dates of birth, viz:

1st. James Brown, born in 1816.
2nd. Died in infancy.
3rd. Died in infancy.
4th. Died in infancy.
5th. Mary Brown, born in 1822.
6th. Sarah Henrietta Brown, born in 1824.
7th. Rachel Fanny Brown, born in 1826.
8th. Charles Clinton Brown, born in 1829.

Consequently, Mary Brown McVey was, in 1896, at date of trial, about 73 years old, and Charles Clinton Brown was about 67 years old, and Rachel Fanny Brown was, if she was really the deceased, 68 years of age at the time she died in 1896.

Henry C. Neff testifies that he knew Rebecca Brown well, and after the disappearance of her husband, John J. Brown, she married a man of the name of White, and that she subsequently died in 1851.

That he and the opponent, C. C. Brown, were boys together, and did many days work together; that they lived in Rome township, Lawrence County, Ohio, they being of about the same age.

That he knew all the children of John J. and Rebecca Brown, except James, the eldest child, and he gave their names and ages—the present residence of Mary, the widow of James L. McVey, being Huntington, West Virginia, which other evidence shows to be only six miles from the old Brown homestead, on the opposite side of the Ohio river.

Jane M. Neff testifies to a like effect as the witness preceding does, and says she knows "that Charles Clinton Brown, Mary Brown, widow of James McVey, and Rachel Fanny Brown, were all members of the same family, living together with their mother, Rebecca Brown, in the same neighborhood with (her), in fact (her) nearest neighbor, and they were reputed to be brother and sisters, and lived together as such."

The testimony of C. Gillet and Robert Hall is to the same effect, except that they state they knew, also, the eldest child, James Brown, who disappeared during his boyhood, and has not been since heard of.

That of Amos McLoughlin is about the same as the testimony of the other Ohio witnesses.

On this evidence our conclusion is that the opponents are brother and sister of Rachel Fanny Brown, and that the three were the issue of the marriage of John J. Brown and Rebecca Brown, and that Rebecca Brown subsequently married White, and thereafter died at the Brown homestead in 1851.

As the evidence shows that James Brown disappeared in 1838, at the age of 22, just sixty-one years ago, no further mention need be made of him; and Mary Brown and Charles C. Brown are the parties opponent to this suit; the only others whose early history needs reviewing are Sarah Henrietta and Rachel Fanny Brown.

The general trend of the testimony is to the effect that Sarah first married a man of the name of Swartoot, in the neighborhood of the old homestead, but that he died shortly after their marriage.

That she then went to Cincinnati, where she married John McCormack in 1839, and that after residing in that city until the spring of 1849, they left for California by the overland route, where she arrived in the spring of 1850, her husband having died on the plains *en route*.

That Rachel Fannie Brown attended school in Lawrence County,

Ohio, during her girlhood, and in 1841, when she was only 15 years old, she went to Cincinnati to live with her sister, Mrs. McCormack.

Concerning this period in the girl's history, a great deal has been said by the witnesses.

Charles C. Brown, one of the opponents, states, that she went to Cincinnati in 1841, or 1842, to live with her sister, Mrs. McCormack, and that she remained there about two years, and went back home.

That she subsequently went back to Cincinnati. That his sister Fanny told him that she had been living with a family of the name of Seymour after she left her sister's house.

The witness says:

"I saw her at Mrs. Seymour's, and I saw her at my sisters, when she lived on Spring street."

He says she told him that "Mrs. Seymour had no children, and wanted to adopt her, but that her mother objected, and thought she had better keep her own name."

The witness states that her sister, Henrietta McCormack, accompanied him around to Mrs. Seymour's to see his sister Fannie, and that it was in the year 1844, when he first went there.

He makes no further mention of his sister, Rachel Fanny Brown, until in the year 1849, when she came back again to Lawrence County, being at that time about twenty-three years of age.

Says it was during the month of March; and on that visit she stated that she and her sister, Mrs. McCormack, were going to California.

That on this occasion his sister, Fanny, brought a little girl with her who was named Cornelia Shelly, and that he and his wife kept her and raised her until she was thirteen years old. That some years afterwards his sister, Sarah, who had married a man of the name of Green, in California, subsequent to the death of McCormack, came back to Lawrence County in company with her husband, and took the little girl away with them.

The witness says that the next intelligence he had of Fannie was through a letter he received, which purported to have came from her in California, but that he never saw her again until 1857.

There is a reason, perhaps, for C. C. Brown not having seen his sister Fannie, and that was that he was absent a great deal from home about that time, and up to 1849 or 1850, as he was then engaged in steamboating on the Ohio and Mississippi rivers, and in chopping

wood in the swamps of Louisiana, only returning home now and then.

But a year or two prior to the death of his mother, in 1851, he was summoned home by a letter from his mother announcing that she was afflicted with a cancer in the mouth, and that this letter reached him at a place near Morgan City, in Louisiana, and that he went home immediately, and attended to and remained with his sick mother until she died, carrying her to physicians, and nursing her.

He states that he purchased and owned the homestead on Paddy Creek, where he was born, and where his parents and the family lived, but that the body of his mother was buried in a neighboring church-yard.

That he thereafter remained in Ohio permanently, and married and established a home there, but in 1857 he removed to the State of Missouri, and as a citizen of that State he enlisted in the Union service, and attained the rank of captain in the Federal army. That, after the close of the war, he returned to his home in Missouri and resided there until 1870, when he removed with his family to Sacramento City, California, where he has since resided, and where he and his family now reside.

He speaks of a visit that his sister, Fanny, made to Ohio in 1857, and the circumstances surrounding it, as connected with her life intermediately in California, and he says that during the years intervening, he and his sister kept up a casual correspondence, and she and his son exchanged letters—his sister residing in New Orleans, and having married Mills.

He also speaks of having met her once, very accidently, in 1870, as he was leaving for California, first having paid a visit to the old homestead in Ohio; and states that on taking passage on a steamboat bound to New Orleans, he found his sister was a passenger also.

He also speaks of a daguerreotype likeness that his sister, Fannie, gave his sister Mary in 1857, on the occasion of her visit in that year, and it was identified by him and other witnesses who were familiar with her at that date, introduced in evidence, and brought up in the original.

He also speaks of his sister Fannie having sent his son a book, as a new year's present, by mail from New Orleans to San Francisco, in 1882; and it he also identified, and produced and filed in evidence; and it is brought up in the original annexed to the transcript.

It is a copy of Milton's Poems, gilt-edged, and bound in morocco leather. It is somewhat worn, and is apparently several years old, being an edition of 1853.

Within there is this inscription on a fly leaf, evidently in the handwriting of a clerical gentleman, viz:

"Presented to my beloved wife, Fanny Sweet.

"A. J. Sweet.

"December 30th, 1871."

And immediately underneath, on the same page, evidently in the handwriting of a woman, is the following inscription, viz:

"Presented to my beloved nephew, Jay R. Brown.

"From your aunt,

"Fanny Sweet,

"December 27th, 1882."

From their appearance, these inscriptions were evidently made several years ago, thus attesting the truthfulness of the witness' statement.

But, in addition to his testimony, other witnesses who knew Fanny Sweet intimately, about the date mentioned, examined the last inscription and identified same as her handwriting.

In confirmation of C. C. Brown's story, he states a fact that has more than ordinary significance, and that is, that on seeing a notice of the death of Fanny Sweet Mills, in a newspaper of Sacramento City, California, on the 9th of January, 1896, he left for New Orleans, Louisiana, on the 15th, and arrived there on the 20th of that month, and soon afterwards filed an application to the public administrator's appointment—she having died in New Orleans on the 5th of January, 1896.

There is another witness, Edward Fulton, whose evidence strongly corroborates the testimony of C. C. Brown in many particulars. He states that he knew a woman of the name of Fanny Sweet, who lived in New Orleans for some time.

He says: "I knew that woman in Cincinnati in 1848 and 1849, the latter part of 1848, and the (early part) of 1849. She lived there, and I lived there at the time. She went by the name of Fanny Smith, to the best of my recollection.  *  *  *

She was living in a house of ill-fame, in a place called Bank Alley, a little alley that ran from Third to Fourth street. I was living there at the time, in 1849, and about the 20th day of December, 1849, I left

Cincinnati, went to New Orleans, and left for California on the 12th of February, 1850, by steamer *via* Panama; and I arrived in San Francisco on the 26th of February, 1850, and went at once to the mines.     There I remained for a few months, and returned to San Francisco and found this woman there and talked with her."

This witness said that he owned and operated a bar on a steamboat running between Cincinnati and New Orleans in the year 1848, and that he stopped off in Cincinnati in 1848, and remained there until he went to California in 1850.    That he was thus engaged from 1838 to 1848, and that while he lived in Cincinnati in 1847 and 1848, he kept a drinking saloon.

That he saw that woman the first time in Bank Alley, Cincinnati, in a house of ill-fame which was kept by her sister, and that he saw her there quite frequently during the time he lived there.

That he knew the two as sisters, and saw and recognized them afterwards in California, as sisters.    That he returned from California in 1859 and did not go back again.

There is no testimony in the record tending to show the whereabouts of Rachel Fanny Brown at any time during the years 1845 and 1846, though it does show that she was in Cincinnati during the years 1841, 1842, 1843 and 1844, and that she was there also in 1847, 1848 and until March, 1849, when she left for California *via* Panama.

Whilst the fact was unknown, to all appearances, to either of the opponents, who resided in the country at some distance from Cincinnati at that time, it was undoubtedly true that both those sisters were what are vulgarly termed "sporting women," and occupied houses of ill-fame while they resided in Cincinnati, and plied their vocation as "women of the town."

In so far as the evidence has been traced, there is no suggestion of there having been such a person known to the witnesses as Fanny Minerva Seymour, though it does show that, in 1844, just prior to her disappearence from her friends and relations, that Fanny Brown resided with a Mrs. Seymour, in Cincinnati, who desired to adopt her, but that she did not then do so, on account of the alleged opposition of her mother.

Fanny M. Smith reached San Francisco, California, in 1850, and lived there a short time in a house of prostitution.   During the same year, she went to Sacramento City and became the proprietress of a

place called the Palace, and the mistress of a gambler of the name of Rube Raines.

The witness, Edward Fulton, relates that while in Sacramento, in 1852, he opened a faro bank in the house of Rube Raines, and that one of the first persons "who faced him was this woman, Fanny Sweet." That she was living with Rube Raines up stairs, and his faro bank was down stairs. That at that time she had a sister living in Sacramento with Charley Green, and that he saw and talked with each of them frequently "of old times and of early days."

A witness of the name of Charles Vandyke states that he knew the woman Fanny Smith at the time she lived in Sacramento, California, when she kept the Palace House, and he remembers and details the circumstances of her shooting a man of the name of Putnam. He states that the man was a stage driver, and that she was arrested, gave bail, and was carried on board of a steamboat, and went away. That he accompanied her on board and acted as her escort, and for his services she gave him one hundred dollars.

That she had a sister who lived in Sacramento at the time, and that she said she came from Virginia. That he heard her say this very often.

A witness of the name of George H. Duvall indentified Fanny M. Smith as the same person whom he saw and knew in New Orleans in 1846, and in 1850 in Sacramento, California.

He says "she dealt faro like a man, and monte too. She was the equal of any man he ever saw."

A witness of the name of Mary E. Russell says she was very intimate with Fanny Smith, and knew her in New Orleans in the early part of 1848, and the fact of her having been in that city at that time is corroborated by excerpts taken from *The Picayune* of that time.

She says Fanny Smith went to California in 1849, and that she afterward met her in New Orleans again in 1853. That "she came back after she shot that man out there," and then went to Panama in 1853. That she saw her again in 1854, but that, at that time, she had changed her name to Hinckley. That she knew her in later years, and had no doubt of her being the same person whom she knew as Fanny Smith in 1856 to 1858.

But it is a noteworthy fact that this witness does *not* speak of Fanny Smith having been in New Orleans in 1857, nor in the early part of 1858, at the time the witness, Edward Fulton, places her in

Cincinnati, and that she does *not* speak of her having been in New Orleans in the early part of 1849, at the time C. C. Brown says she paid a visit to her old home in Ohio.

A witness of the name of John Dunn, who resides in Sacramento, Cal., says he knew Fanny Smith when she resided in that place in 1850, and for two years afterward. That he subsequently saw her in Acapulco, Mexico, in 1853, and repeatedly in New Orleans in 1866 to 1880.

Says he visited her in New Orleans in company with a party of several persons "who went to school with her when they were children in Quaker Bottom, Ohio, and heard them talk together about their old school days," and that he "talked with them and her about her brother Charley, whom they all knew."

He states that he knew her sister, Mrs. McCormack, who lived in Sacramento, quite well, and that he was also well acquainted with Putnam, the stage driver, with whom Fanny Smith had trouble in 1852, and which resulted in her shooting him.

Another witness, H. S. Beals, says he knew Fanny Smith while she lived in Sacramento, Cal., and he recites the Putnam incident as other witnesses have stated it. States that he knows the opponent, C. C. Brown, who now resides in Sacramento, and that he knew Mrs. McCormack while she lived there in 1850 to 1853, and that she and Fanny Smith were sisters of his.

Other witnesses testify to the same facts, substantially.

A witness, N. L. Drew, who resides in Sacramento, says he knew Fanny Smith when she lived in that city in 1850 to 1853, and afterward met with her in Aspinwall, Panama, in 1853, and that she then introduced him to A. M. Hinckley, Hinckley being an agent at that place of Bradford & Co., express agents, and he representing them at Sacramento.

That he went thence to New York on business for the company, and thence to Boston, where he was married, and upon the return of himself and wife to California, via Panama, he met Fannie Sweet again, and Hinckley entertained them while there.

From the foregoing testimony, and that of other witnesses, we deduce the conclusion that Fanny Smith and Mrs. McCormack were the sisters of C. C. Brown; that they went to California in 1849 or 1850, and that they both resided there until Fanny Smith left in 1853,

and returned to New Orleans *via* Panama, when she is first known to have been a friend of Abraham H. Hinckley.

### III.

That Rachel Fanny Brown paid a visit to her old home, and to her brother, C. C. Brown, and her sister, Mary Brown, widow of James L. McVey, in 1857, is attested by many witnesses, and by various public records, and surroundings and corroborating circumstances, but she returned as the lawful, but divorced, wife of A. M. Hinckley, and not as Fanny Brown, nor as Fanny Minerva Seymour.

Hers was not a transitory, accidental, visit out of a spontaneous affection for the relatives and friends of her youth, or love for the home of her childhood.

Quite the contrary; for it is plainly discernable from the evidence that the chief object of her visit was the establishment of her character and repute as a married woman, with all that they implied, at the home of her childhood, from which she had been an outcast, a criminal, and a "wanderer on the face of the earth," though this fact was possibly then unknown to her kindred and friends.

Immediately after her arrival at the house of her brother, C. C. Brown, who then lived in the old family homestead, by whom she was at once recognized, she commenced negotiations with him in regard to the removal of the body of their mother from its resting place in Rome churchyard to a place of private interment on the old homestead. To that C. C. Brown expressed himself opposed, and she thereupon went to the house of her sister, Mary McVey, who subsequently joined in her views and entreaties, with the result of overcoming his opposition, and he thereupon executed in favor of Mrs. Fannie M. Hinckley, a deed to one-half an acre of ground, and the two sisters removed their mother's remains and reinterred them at the exclusive expense of Mrs. Fannie M. Hinckley.

She enclosed the grave with an elaborate iron fence, erected an imposing and costly marble shaft at its head, and had engraved thereon, as an epitaph, two stanzas of intended poetry, which was evidently to make her own grief and tender remembrance of her mother particularly conspicuous.

In this respect one of the stanzas is worthy of reproduction, and it runs thus, viz:

"Hush—the winds and still.

"The evening gloom,

"Whilst *I return* to view

"My mother's tomb,

"And scatter flowers o'er the dust *I love.*"    (Our italics.)

A sketch of this grave, surrounded by an iron fence partially broken down, and overlooked by an aged marble shaft, broken and defaced, has been produced by a photographer, and brought up in the original, annexed to the transcript, exhibiting the following words which are thereon engraved, viz:

"To the memory

of

Rebecca White,

widow of

John J. Brown.

Departed this life

Nov. 15th, 1851,

In the 57th year."

Putting aside all sentiment, this tomb and monument, with its inscription, more faithfully portray than human tongues, the connecting links which inseparably bind together the living and the dead, and it is difficult to conceive of any evidence sufficiently strong to overcome the impression which they convey, that Frances M. Hinckley, by whom they were erected, was the ligitimate daughter of Rebecca Brown, whose remains she thus consecrated to imperishable memory—outcast though she may have been.

The evidence shows that there had been buried by the side of its grand-mother a little child of James and Mary McVey, and that its body had been taken up and removed at the same time with the body of Rebecca Brown, and that both bodies had been reinterred together.

McVey having been absent at the time of their removal, he made complaint about it upon his return, and trouble ensued between him and his sister-in-law about it, which eventuated in a prosecution of the former on a charge of criminal libel, which was preferred by the latter.

The affidavit was made and signed by R. F. M. Hinckley on the 12th of September, 1857.

As these proceedings are very fully set out and characterized in the opinion of the district judge, it will be unnecessary to give any more of the details thereof, but one thing further is worthy of note, and that is that in these proceedings, filed in the court of the county in which she had lived during childhood, her maiden name, *Rachel Fanny*, is made prominent, as the initials R. F. M., doubtless, represent *Rachel Fanny Marie*.

And it is equally true that the names of Fanny M. Smith, Fanny Sweet and Fanny Minerva Seymour, were only conspicuous by their absence from these records and proceedings, and this was evidently because Fanny was playing an altogether different *role* at the time.

Several of the Ohio witnesses state, emphatically and unequivocally, that they saw, recognized and conversed with Mrs. R. F. M Hinckley on the occasion of her visit in 1857, and they specially mention the circumstances of her having the body of her mother removed from Rome churchyard to the old homestead on Paddy Creek.

Each one, in turn, says:

"I know Rachel Fanny Brown, and Rachel Fanny Hinckley, were one and the same person."

Nor is it at all surprising that these witnesses should have remembered a circumstance at once so important and conspicuous in their lives as that of the sudden return to this rural vicinage of a person who, in youth, was as humble as they, but then clad in the habiliments of great wealth, and the divorced wife of a wealthy and prominent man of the city of New York.

As an illustration of the great store which the deceased set by this marriage of hers, and as proof of the identity of Rachel Fanny Brown with Fanny Minerva Mills, we attract attention to the documents which were found in a little package in her bank box after her death, which were a certified copy of the opinion of the Supreme Court of New York, pronouncing her divorced from her husband, A. M. Hinckley, *on the ground of his adultery;* an original letter which was written to her by C. A. Stetson, dated February 6th, 1857, at the Astor House, and another letter which was written by Hon. R. M. Blatchford, of New York, having similar date as last, and addressed to Col. Blymer, American Consul at Havana, as an introduction for her.

These documents are old, and much worn, doubtless, from use, which attests the value the deceased placed upon them as treasures.

But, notwithstanding all these historical facts, and their apparent importance to the woman in question, this record conspicuously shows that she straightway relapsed into her habits of infamy and vicious indulgences; for, in subsequent years, she dwelt in New Orleans principally, where she was very generally known as a prostitute.

The witness, Edward Fulton, states that he was in New Orleans in 1858, and frequently saw and talked with Fanny Sweet of old times; that he saw her while she lived at the corner of Gasquet and Basin streets, New Orleans.

That she would see him passing by and call him in, and that these interviews continued at intervals through many years; the last one having occurred not more than three weeks prior to her death.

He states that he had no doubt of this woman having been Fanny Sweet, Fanny Hinckley and Fanny Mills.

He said:

"The same identical woman, and the same woman that I knew in Cincinnati by the name of Fanny Smith, the same woman; the very same."

Being shown the daguerreotype which is in evidence, he recognized it at once as that of the woman he knew, and said: "Yes, sir; the likeness of Fanny Sweet and Fanny Hinckley— the same woman."

Another witness, Amos McLoughlin, who figures somewhat conspicuously in this record, states that he knew the claimants in this case, and their parents, as far back as 1837, and he gives the names of all the children. Said he saw Fanny Brown during her visit to Ohio in 1857, as Mrs. Hinckley. That "she had her mother taken out of the cemetery and buried on the home place. I afterward saw Rachel Fanny Brown in New Orleans, La., several times, and talked with her. I met her the first time in New Orleans at her residence on Canal street. She then called herself Fannie Sweet."

   *   *   *   *   *   *

"I knew Rachel Fanny Brown when she was a girl. I saw and knew her when she was in this country, and called herself Rachel Fanny Maria Hinckley, and I knew her in New Orleans as Fanny Sweet—all the same person. * * *

. "I first knew Rachel Fanny Brown spoken of when she was a child going to school at Rome, Lawrence County, Ohio. I went to school there, too.

\* \* \* \* \* \*

"She was the sister of Charles Clinton Brown and Mrs. Mary Brown McVey. She lived with them in the same house as brother and sister. They claimed the same mother, and were always known to sustain that relation, and I never knew of any question being raised as to such relationship."

He says that in 1857, during her visit to Ohio, he "saw her about every day. She was engaged in a law-suit with her brother-in-law, James McVey, and while there that summer took up her mother's body and moved it to the old home place of her mother. She made her headquarters with her sister, Mrs. Mary McVey, until she had that law suit, and then she moved to Wallis Lewis, and made her home there."

But, possibly, one of the most striking incidents in this remarkable history is that related by John F. Mollere, who says:

"Some time in the month of June, 1846, while I was a sailor on the ship Waterloo, commanded by Captain Allen, on my way from Liverpool to New York, on about the third day out at sea, I saw a young lady who was sitting on a bench about midship of the vessel, and she seemed to be in great distress. While passing her, she stopped me and asked me if I could suggest something to her that would relieve her of sea-sickness. I told her I would try, and went forward and brought her a big cup full of salt water. I told her to shut her eyes and drink, and she did. A few minutes after drinking it, she commenced to get very sick, and proceeded to the rail of the ship and vomited overboard. After this, she went back to the bench on which she had been sitting and went off in a kind of doze. A short time afterward I went to her, and she told me she was feeling a great deal better, and said she was very hungry. I told her I would get her something to eat, which I did. She relished this very much, and shortly afterward told me she had never felt better.

"Her name, as she told me, was Miss Fanny Seymour.

"I saw her after that on the voyage, almost daily.

"She told me she was going to New York on a pleasure trip, when she would return to London, her native home, where she was born and

raised. After our arrival in New York, she bade me good bye, and *told me she would show me the beautiful sights of the city."*

This witness stated that he afterward went to Nashville, Tennessee, and thence to Mexico, as an enlisted soldier, and served until the end of the war, and is now drawing a pension therefor.

This witness said:

"When the gold fever broke out, I went to California, and arrived there in June, 1849.

"After being there a short time, who should I meet on the street but Miss Fannie Seymour. We had a long conversation, talking over the pleasant time we had coming over from Liverpool to New York."

He states that he bade her good-bye, and went into the mines, and "never saw her any more till he returned home in 1857, when he met her on Canal street (in New Orleans), and after a pleasant chat she informed him that she had changed her name from Fannie Seymour to Fannie Sweet."

He then states:

"We became very intimately acquainted, and I never lost sight of Mrs. Sweet for a longer period than a month from that time to the breaking out of the Civil war. After the war, I met her again, and kept up our acquaintance until I came to Washington, D. C., in 1868, as an officer of the United States. I have never seen her since."

The witness fully identified the girl, Fanny Seymour, whom he intimately knew on the vessel, Waterloo, in 1846, as the woman whom he met in California in 1850, and familiarly knew in New Orleans from 1857 to 1860, and again in 1866 to 1868, as Fanny Sweet.

There is a fact stated in the testimony of this witness which possesses striking significance, when it is taken in connection with the evidence of other witnesses who speak of Fanny Brown at a shortly previous date thereto, and the testimony of those witnesses who speak of the career of Fanny Smith in California, and that of Fanny Sweet in New Orleanas, subsequently.

It is that "after (their) arrival in New York, she (bade) him good bye and told him *she would show (him) the beautiful sights of the city."*

Surely, that invitation coming from a young girl, to a sailor whose acquaintance she had made under the circumstances he recites, possessed a clear significance, which he readily understood, and of which he undoubtedly availed himself.

For the question naturally arises, as to the manner in which a young girl just out from London on a pleasure excursion, had *already* acquired a knowledge "of the beautiful sights of the city" of New York, which she had, supposedly, never seen.

In our opinion, the testimony of that witness, which first develops the character of Fanny Seymour, at the same time annihilates the theory of the State that is founded upon its superstructure.

The whole of the after life of the deceased, characterizes her as the same person as Fanny Seymour; and the testimony develops the fact that she, on that voyage, adopted the name, Fanny Seymour, as a means of disguising herself from the scrutiny of friends into the life she was leading—she having recently been Fanny Brown.

This idea is clearly foreshadowed in the statement of C. C. Brown, that in 1843 and 1844, she was living in Cincinnati with a Mrs. Seymour who wished to adopt her; and that soon afterwards she disappeared altogether from her family.

But she must have found her way to New York, and by this means become acquainted with "the beautiful sights of that city."

The fact which stands forth prominently, through the lights and shadows which are portrayed by the testimony, is that *when Fanny Brown disappeared, Fanny Seymour made her appearance;* and that as soon as she returned among her relatives and friends in Ohio, *again she became Fanny Brown,* and Fanny Seymour disappeared altogether.

Retracing the incidents of the life of the deceased, from January, 1896, as the widow of William R. Mills, to June, 1846, when, as Fanny Seymour—just one-half a century before—she made the voyage from Liverpool to New York, the faithful historian must necessarily review those which occured in California in 1850, those in New York in 1853, and 1855, and those which transpired in Ohio in 1857; and having performed the ungracious task, our conclusion is, that Mrs. F. M. Hinckley, who visited Ohio in 1857 and removed the remains of Rebecca Brown from Rome churchyard to the old Brown homestead on Paddy Creek, and erected a monument to her memory, was none other than the Rachael Fanny Brown, who was the daughter of the deceased, John J. Brown and Rebecca Smallwood, and the sister of the opponents; of whom they are the sole and exclusive heirs at law.

MOTION TO REMAND.

The Attorney General, in the motion, alleges "that on account of *partial* developments of facts before the trial, and of certain occurrences on the trial, he became strongly impressed with the conviction that plaintiffs had not *fairly* exposed their family history," etc., and that, consequently, he determined to make a more extensive investigation. His plan was, subsequent to the rendition of final judgment, to send Captain John Price, a detective, to Ohio, to institute rigid inquiries amongst the people of the vicinity where Rachel Fanny Brown was born, and resided during her girlhood, in order to ascertain the real facts and incidents of her history.

The investigation which that detective set on foot, and the affidavits which he procured, constitute the basis of this application.

The statement of Captain Price, which is, of course, only hearsay, is to the effect that he gained much of his information from Amos McLoughlin, whose testimony has been already adverted to.

He states that he learned from him "that Rachel Brown, during the years 1844 and 1845, and including a part of 1846, had been employed as a chamber maid in a hotel in Guyandotte, Virginia, a town opposite Proctorville, Ohio. That the name of the hotel was Chapman House, and that Rachel Brown had worked there as late as 1845, or 1846. That after Rachel Brown disappeared from Guyandotte, and the neighborhood surrounding Proctorville, in or about 1846, she had gone down to the city of Cincinnati, and joined her sister, Sarah, who had ceased her occupation as a chambermaid, and had opened a house of prostitution in Bank Alley, or Bank street.   *   *   *

"That Sarah and Rachel Brown plied their vocation as prostitutes in Bank Alley for some years *subsequent to 1846* under the name of the Stevens sisters," etc.

In one of the letters which were written by Amos McLoughlin, in January, of 1897, to Captain Price, and which is annexed to the motion to remand as an exhibit, that statement is, substantially, borne out; but that witness has since died.

To the motion is likewise annexed the affidavit of one E. E. Swartwood, bearing date February 15th, 1897, as an exhibit, from which we extract the following, viz:

"That he went from New York to Lawrence County, Ohio, in 1833 or 1834, and has lived there ever since. That he knew the Brown

family which lived in that county ever since. That there were three girls, Mary, Sarah and Rachel, and two boys, James and Clinton.

"That affiant married Sarah Brown, she being his first wife. That after living together a few months, his wife, Sarah, left him, and went away, and that he never knew anything about her since. That when he married Sarah, her sister was a girl about twelve or thirteen years of age, and after her sister left, Rachel stayed at home with her family until she was grown, and did not leave the county until 1846 or 1847. That when she left them it was reported that she had gone to join her sister, Sarah, in Cincinnati, but affiant never knew anything further of them, except hearing of Rachel returning to the neighborhood about ten years afterward, and having her mother's body removed to the old homestead, and having a tomb built," etc.

In the affidavit of Daniel Floyd and Francis Nichols, a slightly different statement is made with regard to dates, but both of them say that they knew the Brown family, and "the Brown girls, Sarah and Rachel," and "that Rachel came back and had her mother's remains removed and a tomb built for her," etc.

The affidavits of several other persons are all likewise to the effect that "the Brown girls, Sarah and Rachel," were living in Cincinnati in 1847, 1848 and part of 1849, as public prostitutes in Bank Alley.

The affidavits of several other persons detail many similar facts, only slightly varying the possible dates of their occurrence, but all of them disclose the two Brown girls, or "the two Brownies," as they were sometimes called, as conspicuous figures in that city then.

The declaration of two or three of the affiants is to the effect that "the Brown girls" were not identical with Fanny Smith and Mrs. McCormack, who were in California in 1850 and 1852, though they, at the same time, identify Fanny Brown with Fanny Sweet of New Orleans in 1856 and 1858.

But, accepting all these as the strictly truthful declarations of the witnesses, and for the purposes of the motion, considering same as part of the evidence on the principal issue in the case, the identity of Rachel Fanny Brown as the deceased, what is the correct conclusion to be deduced therefrom?

In our opinion, the conclusion at which we first arrived is not thereby materially altered. For they are perfectly consistent with the evidence in the record with regard to the lives and characters of "the Brown girls," and particularly of that of Rachel Fanny Brown, but in

one important particular they make a new disclosure to the effect that Rachel Fanny Brown resided in the vicinity of her childhood's home in 1844 and 1845, and a part of 1846—a period of time during which she had not been theretofore accounted for by any of the witnesses.

They further definitely disclose the fact that in the latter part of 1845, or the early part of 1846, she discontinued her employment as a chambermaid at the Chapman House, at Guyandotte, Virginia, and returned to Cincinnati. That statement more closely connects Fanny Brown with the character of Fanny Seymour in June, 1846, than the testimony of the witnesses had done, but it is no way inconsistent therewith.

On the contrary, it makes it all the more probable that Fanny Brown made her way to New York, and thence to London, in the early part of 1846, from which latter place she was returning in June, 1846, on the Waterloo.

That statement is not inconsistent with that of the witness, Edward Fulton, who said he knew Fanny Brown intimately in Cincinnati in 1847, and in the early part of 1848; nor that of George H. Duval, who saw and knew her in New Orleans in 1846—both of whom saw and knew her in California in 1850.

The statements of those affiants, and the evidence of the witnesses, are generally consistant, with the exception of some minor details.

And inasmuch as our conclusion, is that if those various persons were interrogated as witnesses, their testimony would not alter the decision we have already announced, the motion to remand should be, and the same is, refused.

Judgment affirmed.

The CHIEF JUSTICE takes no part in this opinion, not having heard the argument.

## ON APPLICATION FOR A REHEARING.

NICHOLLS, C. J. The court has carefully considered the reasons assigned for and against the application made for a rehearing of this case, and the arguments of counsel for the appellant and the appellees, and it is as fully prepared to reach and announce its conclusions now as it would be upon a rehearing formally granted. The court is not fully satisfied with the condition of the evidence, and is of the opinion that the interests of justice will be best subserved by setting aside the

judgment which it has heretofore rendered herein, and also that of the District Court, which has been appealed from, and remanding the cause to the District Court, there to be reinstated and tried on the evidence already taken in the case, and such additional evidence as both parties can and shall produce.

For the reasons assigned:

It is hereby ordered, adjudged and decreed, that the judgment heretofore rendered by the court in this case be, and the same is hereby set aside, and it is further ordered, adjudged and decreed, that the judgment of the District Court appealed from, be and the same is hereby annulled, avoided and reversed, and the cause remanded to, and reinstated on the docket of the District Court to be by said court tried on the evidence and testimony already taken in the case, and such additional evidence and testimony as the parties can and shall produce.

It is further decreed that the question of costs be reserved, to be disposed of on the final judgment in the cause. A formal rehearing being unnecessary, the application for the same is hereby refused.

---

MONROE, J. The only question left in dispute in this case is, whether the decedent was Rachel Fanny Brown, born in Lawrence County, Ohio, or Fanny Minerva Seymour, said to have been born in England, and to have come to this country on the ship "Waterloo," in 1846? The testimony taken since the case was remanded, has brought out some of the facts more distinctly. The judge a. quo has again decided in favor of the Brown claimants (Mrs. McVey having departed this life in the meanwhile, and having been succeeded by her only daughter, and sole heir, Mrs. Rosanna McVey Fuller), and the State has again appealed.

The following facts are either undisputed, or else are established, by such an overwhelming preponderance of proof and probability as to place them, practically, beyond dispute, to-wit:

The woman whose succession is in controversy, at that time publicly known as Fanny M. Smith, and also giving, in conversation, the name Fanny M. Seymour, was leading the life of a prostitute in New Orleans, as early as the winter of 1846-47. She was sued in 1847, as Fanny M. Smith, for the funeral expenses of one Smith, who was said to have been her husband, and to have died in New Orleans, in the

parish prison; and, in September and October, 1848, she was brought before the recorder on several occasions and acquired something of a police record. In 1849, she went to California, either by way of Cape Horn or the Isthmus, was in San Francisco in 1850, and, thereafter, in Sacramento until about December 21, 1852. In San Francisco she appears to have been identified and associated with "Reub Raines (or Reynes, or possibly Reynez), a gambler, and, in Sacramento, she was the proprietress of a brothal known as the "Palace," and continued her association with Reynes (Raines, or Reynez), who then kept a gambling house known as the "Eldorado." She was commonly understood, at that time, to be the sister of "Leah," or "Leo Duell," (who was also known as Henrietta McCormack, and as the wife of "Charley Green," the proprietor of a stage line, and who is indisputably identified as Sarah Henrietta Brown, of whom we shall have occasion to speak hereafter), and they passed, and recognized each other, then, and afterwards, as sisters. In November, 1850, the decedent, as "Fanny Seymour," sued John A. Van Houten, in San Francisco, on a promissory note, and, in June, 1851, filed an affidavit for continuance, in which she mentions the name of Leah Duell as one of the witnesses, whose testimony she desires to be heard. In this suit, she obtained judgment for $3010.00, with interest, which judgment appears to have been subsequently assigned to E. J. C. Stevens and "Reuben Raquez," and to have been, thereafter, satisfied March 7, 1853. Upon the evening of December 20, 1852, at her house, called the "Palace," in Sacramento, which she conducted as Fanny Smith, she shot Albert Putnam, a stage driver, and was threatened with hanging by a mob, but was taken by the marshal to a prison brig, in the river, and thereafter admitted to bail in the sum of $3000.00, after which she disappeared, forfeiting her bond. Her associate, Reub Raines, or Reynes, is said to have signed the bond, and as a person, whose name is given as Reuben Raquez, subsequently became one of the assignees of the judgment obtained by her against Van Houten for $3010.00, it seems not improbable that, allowing for error in the transcription of the name, he was one and the same as her friend and associate, Reub Reynes. The decedent was next seen at Acapulco, Mexico, and then, in May, 1853, at Aspinwall, Panama, at which latter place she was living, as his wife, with Abraham Miller Hinckley, the agent of Burford & Co., a concern engaged in the express business. She was not then married to Hinckley, but subsequently married him in New York City. October

1, 1853, and was divorced from him, by a judgment rendered by Judge Peabody, of the Supreme Court of New York, December 15th, 1856. During her marriage she was a good deal in New Orleans, without her husband, but spent most of the time with him in New York, making a short visit to Panama. After her divorce, which she obtained as "Fanny Maria Hinckley," she left New York for Havana in January, 1857, and may possibly, at that time, also have visited Jamaica. Whilst in Havana, she seems to have become the subject of animadversion of some kind, and to have obtained certificates of character, as will appear hereafter. She appears to have reached New Orleans in May, 1857, and it seems likely, that, upon her arrival in this city, she, for the first time, made use, for public purposes, of the name "Fanny Sweet," though then and thereafter, for the purposes of any legitimate business, she called herself Fanny Minerva Seymour, widow, or divorced wife, of Abraham Miller Hinckley. In 1860, and later on at various dates up to November 13, 1895, she executed, in New Orleans, notarial acts of purchase and sale, and wills, etc., in which she so described herself; the last act being an instrument by which, upon November 13th, 1895, she annulled all wills previously made by her, and in which she was described as "Fanny Minerva Seymour, widow by first marriage of Abraham Miller Hinckley, and widow by second marriage of William R. Mills."

In 1861 she left New Orleans with one William G. Stevens, who is said to have had a commission to buy gunpowder for the Confederate government. She was, on this occasion, dressed as a man, and passed as "Freddy Stevens," but her sex was discovered in Texas, and the affair attained considerable notoriety, more particularly as she reappeared in New Orleans not long afterwards, without Stevens, who was reported dead. Lincoln, a witness who was examined for the purposes of the present case, testified that he also accompanied Stevens, but quarrelled with him upon finding out the sex of the third member of the party, and that he understood that Stevens died of a congestive chill. However, that may be, Mrs. Fanny M. Hinckley sued his succession on certain drafts which she brought back with her, and, in May, 1865, recovered $3255.55, less her attorneys fees. She thereafter lived in New Orleans, using the name "Fanny Sweet" for the purposes of the demi-monde, and otherwise using the name "Fanny Minerva Seymour, widow, or divorced wife, of A. M. Hinckley," as hereinbefore stated, and, upon August 9, 1879, she married William Reed Mills,

with whom she lived until his death in 1891. After that event she continued to live in New Orleans until she was called to her final account, upon January 6th, 1896. She left an estate valued at $54,765.68, consisting mainly of United States bonds, which had been registered in the name of "Fanny M. Hinckley," although the money with which they were purchased is said to have been acquired from the estate of her last husband. There was also found among the assets of the decedent a bank box in which was a package (being an envelope sealed with mucilage) bearing the following inscription, to-wit:

"Kind friend will you please, at my death, burn this package and oblige the dead. Mrs. Fanny M. Hinckley." "I will plead for you in Heaven, if you do as I request, and burn this package."

The evidence shows that this package was made up at her house in New Orleans, and under her direction and immediate supervision, of papers furnished by her, and that the inscription was placed thereon at her request and dictation, and that she allowed the person who performed this service to see the papers concerning the divorce, which were enclosed in the package, but would not allow him to see the letters. The bank box was placed in the custody of the notary who made the inventory of the estate, and the package was produced by him, and opened, in the presence of the court and of all parties in interest, upon the motion of the counsel representing the public administrator, and was found to contain:

1. Certified copy of the decree of the Supreme Court of New York, rendered December 15, 1856, dissolving the marriage between Fanny Maria Hinckley and Abraham Miller Hinckley.

2. Copy of the opinion of Judge Peabody, upon which said decree was based, in which he finds that the defendant admitted, and was guilty of, certain acts of adultery charged against him; that they had not been condoned by the plaintiff, and that the plaintiff was not shown to have been at fault.

3. Letter purporting to have been written and signed by C. A. Stetson, dated, Astor House, February 5, 1857, addressed to Mrs. Fanny Hinckley, in which the writer says, *inter alia:* "I have heard with no little chagrin, that slander has been busy with your interests. Nothing could be more unjust toward you than any suspicion of your purity." And proceeds further to assure her of her virtue at considerable length.

4. Letter purporting to have been written and signed by R. M. Blatchford, dated New York, February 6, 1857, addressed to Col. Blythe, American Consul, Havana, in which the writer, among other things, says: "I have not the pleasure of a personal acquaintance with you, but that shall not deter me from writing to you in behalf of a worthy and deeply wronged lady, now in Havana. I allude to Mrs. Hinckley, recently divorced by our law from her husband. The proceedings were had before Judge Peabody, of this State, who will, I doubt not, add his testimony to mine. I should be very sorry if this deserving lady should suffer from any unjust and cruel suspicions and slanders. She has suffered enough already from one who was bound to protect and cherish instead of abusing and neglecting, her." etc.

The record in the divorce suit, a certified copy of which is in evidence, shows that the proceedings were begun February 1, 1856. In her complaint, the plaintiff alleges that she married the defendant in New York, October 1, 1853; that three weeks later she went to New Orleans and her husband to Panama, where she joined him in March, 1854; that, in May, 1854, they returned together to New York, where they remained until August 27th, 1854, when she went to New Orleans, leaving him in New York. That her husband remained in New York until October, 1854, when he again went to Panama, and there remained (save for one visit to New York, in February, 1855), until April 1855, when he returned to New York, where she joined him in June, 1855, after which they remained together in New York until she left him, January 17, 1856, and brought the suit for divorce. She charges him with certain acts of adultery, alleges that she did not condone them, and did not cohabit with him after August 27th 1854, and prays for judgment dissolving the marriage—signing the affidavit, attached to the complaint, "Fanny Maria Hinckley."

The defendant, in his answer, alleges that the plaintiff was a woman of bad character and antecedents when he married her, and that he took her as a wife upon her solemn pledge that she would reform, but that she went to New Orleans in the summer of 1854 and remained until the spring of 1855, and that he learned, through the press, and through his correspondence, that her conduct in New Orleans was so infamous, that he did not suppose that she would ever seek to live with him again, and that he, himself, at that time, indulged in some of the excesses charged against him. That, thereafter, however, she made overtures, as a result of which they were reconciled and reunited, upon

a basis of mutual forgiveness, and lived together until within a few days of the filing of the suit.

The defence appears to have been perfunctory, and the judgment not only gave the plaintiff the divorce for which she asked but also furnished her with a certificate of character, to which she added the letters heretofore mentioned, and thus made up a record which she seems to have preserved and cherished for the remaining forty years of her life.

Other facts equally undisputed, or equally established by proof and probability, are as follows, to-wit:

John Jacob, or Jacob Brown and Rebecca Smallwood, were married in Montgomery County, Virginia, December 26, 1814, and, thereafter, moved to Lawrence County, Ohio; first, to the Sand Fork of Symmes Creek, and, afterward, to Quaker Bottom, on Paddy Creek, in Rome township, where they lived together until about 1833, when Brown left his wife, and, subsequently, died, in Warren County. Rebecca remained in Quaker Bottom, on a farm which she appears to have owned, and, at a later period, married John White, but did not long survive the marriage. She died in 1851. Whilst Jacob Brown and his wife lived together in Quaker Bottom, they had five children who attained majority, viz:

1. James, born about 1816, died, unmarried, in 1838.

2. Mary, called "Polly," born December 7th, 1821, married James L. McVey, and lived in Lawrence County until toward the close of her life, when she moved to Huntington, West Virginia, where she died since the institution of these proceedings, and after having given her testimony. She has been succeeded herein as plaintiff by her only daughter, and heir, Rosanna McVey Fuller.

3. Sarah Henrietta, born about 1823, or 1824, married E. E. Swartwood, from whom she soon separated. She appeared as a public woman, in Cincinnati, in the early forties, and was first known as Sal Woods. Subsequently, she became identified with one John McCormack, a carpenter, and is said to have married him. She, at all events, took his name, and called herself Henrietta McCormack, and, in that name, kept an establishment in Bank Alley, in Cincinnati, for six or eight years preceding the year 1849. McCormack did not, however, live with her, but lived with his mother. In 1849, Henrietta sent to her mother a little girl called Cordelia Shelly, but subsequently known as Cordelia McCormack, who remained with Mrs. Brown until the

latter's death, and was then taken by Mrs. McVey, and lived at her house until, probably, 1854, or 1855. After thus disposing of the little girl, Henrietta went to California, reaching there in 1849, or 1850, and, after stopping in San Francisco, established herself in Sacramento as "Leah," or "Leo Duell." She also made use of the name McCormack, and built a house in Sacramento called the "McCormack House." She soon became associated with "Charley Green," proprietor of a stage line, and is supposed to have married him; she, at all event, lived with him, as his wife, and, sometime between 1853 and 1857, visited, with him as her husband, her relatives in Quaker Bottom, Ohio. Upon the occasion of this visit, she called herself "Mary Henrietta Green," and explained her use of the name "Mary" by saying that she had taken it upon entering the Catholic Church. Upon leaving she took with her the little girl, Cordelia, who was an inmate of Mrs. McVey's house, and she seems to have taken care of this little girl thereafter until the latter's death, in California, a few years ago. Charley Green subsequently died, and Henrietta married Ezra Woolson, who survived her. She died in Sacramento, in 1872, and left her property to Charles Clinton Brown, her brother, subject to a condition that if he failed to comply with certain wishes, expressed in her will, the property should go to the children of her niece, Rosanna McVey Fuller. Included in the property thus disposed of was the "McCormack House," which was still standing and still known by that name, and, for aught that appears, is so to this day. During the years 1851 and 1852, and, perhaps, as early as 1850, Henrietta McCormack, or as she was then more publicly known, until she married or became identified with Green, Leah, or Leo, Duell, was commonly understood to be the sister of Fanny Smith, otherwise called Fanny Seymour, the, then, proprietress of the Palace in Sacramento, the woman whose succession is here in controversy, and each recognized and spoke of the other as her sister.

4. Rachel Fanny, whose history will be considered later on.

5. Charles Clinton, born February 9th, 1829, worked, after attaining the age of about thirteen years, on flat boats on the Ohio and Mississippi rivers and in the swamps of Louisiana, returning to his home in Ohio at intervals of five or six months, or a year. He bought the "farm" from his mother and lived there after her death until sometime in November, 1857, when he left Ohio and went to Missouri, and, finally, to Sacramento, California, where, upon the death of his sister,

Mary Henrietta Woolson, in 1872, being one of her executors and universal legatee, he settled her estate and went into possession thereof, and was living there, January 6th, 1896, when the decedent departed this life. He saw a notice of her death in the paper of January 9, left for New Orleans on the 15th, reached here January 20th, and, with his sister, Mrs. McVey, filed a petition herein January 30th, 1896, claiming the estate as one of the heirs.

Reverting to the history of Rachel Fanny Brown, and still confining ouselves to facts which are undisputed, or which, as we think, are so clearly established as to be beyond dispute, we find:

That she grew up, as did the others, at Paddy Creek, and, though she may have gone off, at times, to work at Guyandotte, or elsewhere, or may have gone off for other purposes, and may, now and then, have been an inmate of her sister's house on Bank Alley, in Cincinnati, she did not permanently leave home until the fall of 1846; after which, until some time in 1849, she was heard of, by the Lawrence County people, as leading a disreputable life in Cincinnati and New Orleans. In 1849 she reappeared, bringing with her, as from her sister Henrietta, the little girl Cordelia, and leaving this little girl with her (Rachael Fanny's) mother, she went to California, not with her sister Henrietta, who crossed the plains, but by way, either of Cape Horn, or the Isthmus of Panama, and nothing more was seen of her in Ohio until the spring or summer of 1857. In 1857, she again visited her old home in Ohio. Upon this occasion, as "Fanny Maria Hinckley," she was, for awhile, the guest of her brother, Charles Clinton Brown, at the old farm. From his house she went to that of her sister, Mrs. McVey, and from McVey's, having quarrelled with her brother-in-law, James L. McVey, she went to board with Wallace Lewis. She expressed a desire to have her mother's remains removed from the Rome churchyard and reinterred on the farm which had been her home, and, after some opposition, her brother, Charles Clinton, and her sister, Mrs. McVey, consented, and the former, who was joined by his wife, made a deed to her of a piece of ground—being part of the farm—suited to that purpose. This deed is dated September 15, 1857, was duly recorded October 30th of the same year, and contains the following recital, to-wit:

2. "Know all men by these presents; that we, Charles Clinton "Brown and Frances Elizabeth Brown, his wife, of Rome, in Law-"rence County, and State of Ohio, for, and in consideration of, ten

" dollars, to us paid by Rachel Fanny Maria Hinckley, of the City of
" New York, in the State of New York, the receipt whereof is duly
" acknowledged, do grant, bargain, sell, and convey to the said Rachael
" Fanny Maria Hinckley, her heirs and assigns forever, the cemetery
" in which her mother, Rebecca White, widow of John J. Brown, de-
" ceased, is buried, and in which our sister, Rachael Fanny Maria
" Hinckley has lately caused a monument to be erected as a tribute of
" love to her mother." And then follows a more particular descrip-
tion of the property.

As the result of her quarrel with McVey, Mrs. Hinckley caused a
criminal action to be brought against him in a justice court, and also
brought a civil action in the Court of Common Pleas, and, in both,
she was represented by John S. George, Esq., an attorney at law, whose
office was at Ironton, in Lawrence County. The criminal action was
begun by an affidavit, dated September 12, 1857, and reading, in part,
as follows, to-wit:

"R. F. M. Hinckley, being duly sworn, according to law, deposeth
" and sayeth, that on or about the 30th day of August, 1857, at the
" county of Lawrence aforesaid, one James L. McVey, late of said
" county, did knowingly send to this affiant a writing signed with a
" fictitious name and containing wilful and malicious threats of
" injury, which said threats were intended and designed as threats
" against the affiant, and are in the words and figures following, that
" is to say:

"ROME, August 30, 1857.

"To the celebrated, far-famed, and world-renowned New York lady.
" Notice is hereby given that three or four days will be given you to
" quietly leave the place, and if the above requisition is not complied
" with, within the stipulated time, the civil citizens of this place will
" no longer allow their peace and quiet to be disturbed by the avarice
" passions of such an outraged female monster. You may expect a
" rich suit of tar and feathers, and a free pass down the river on a
" slab. The above is the sentiments of many citizens of this place, who
" will not fail to execute their designs.

"JUDGE LYNCH."

"And this deponent says she verily believes that one James L. Mc-
" Vey is guilty of the facts charged, and further the deponent sayeth
" not.                         (Signed)    R. F. M. HINCKLEY".

The matter came up for hearing, September 14, 1857, and was continued upon the application of John S. George, Esq., who appeared for the State, on the ground that Clinton Brown, a material witness, was absent. It was again called for trial September 17th, and was heard, though the witness Brown was still absent, and the proceeding was dismissed at the cost of the prosecuting witness. The civil action in the court of Common Pleas, however, remained pending.

John S. George was a prominent lawyer at Ironton, who died in 1895. He had associated with him, for some years before his death, Mr. J. N. Ross, also a member of the bar, and, after his death, his papers were turned over to Mr. Ross, who was charged with the settlement of his business. Among these papers were found the deed from Clinton Brown and wife, which has been mentioned, and also a number of documents, shown to be in the handwriting of Mr. George, and purporting to be copies of letters written by him to Mrs. Fanny M. Hinckley, and to other persons concerning her, with indorsements in the same handwriting to the effect that they were copies of originals which had been sent by mail. There were also found other papers purporting to be the original answers from Mrs. Hinckley, and from the other persons referred to above, to the letters addressed to them by Mr. George. These documents have been brought up in the originals, and are in substance as follows, to-wit:

"A." Copy of letter from John S. George to Hon. R. M. Blatchford, New York, dated Ironton, September 20th, 1857, inquiring as to the financial and social standing of Mrs. Fanny M. Hinckley.

"D." Document purporting to be the original answer to the above, dated New York, September 29, 1857, apparently in the same handwriting, and similarly signed, as the letter addressed to Col. Blythe, American Consul, Havana, dated February 6th, 1857, and found in the bank box of the decedent. The writer replying to Mr. George's inquiries, says, *inter alia:*

"I have your letter of the 20th instant, inquiring about Mrs. Hinck-
"ley. My acquaintance with her is limited. I knew her, profession-
"ally only, last September, and she left here in January, for Havana,
"since which time I have not seen her. She applied for and obtained,
"last winter, a divorce from a very bad husband. I never saw her in
"society, but believe her to be a perfectly virtuous woman. I had
"supposed that she would have been here this past summer, but I have
"heard nothing of, or from, her since early in the season, when she

" wrote me that she was without means to get here, and I collected for
" her $75, from some one who was indebted to her and forwarded it to
" her," etc.

"B." Copy of letter from John S. George to C. A. Stetson, New
York, dated Ironton, October 5, 1857, also inquiring as to the financial
and social standing of Mrs. Fanny M. Hinckley.

"C." Document purporting to be the original answer to the above,
dated Astor House, New York, October 10, 1857, in which the writer
says:

"The only knowledge I have of Mrs. Hinckley was gained during the
" payment of a debt contracted by my old partner.  She won the re-
" gard of those who came in contact with her.  Of her pecuniary re-
" sources, I know nothing.  Report states that she owns property in
" New Orleans."

This letter is apparently in the same handwriting, and is similarly
signed, as the letter addressed to Mrs. Fanny Hinckley, found in the
bank box of the decedent.

"E." Document purporting to be an original letter from Mrs.
Hinckley to Mr. George, dated New York, December 17, 1857, in which
the writer speaks of having arrived in New York on "Friday"; says
that her stay in Cincinnati was longer than she expected; that her af-
fairs in New York are in a deplorable condition, and requests him to
address his letters to Mrs. F. M. Hinckley, New York, under cover to
Mrs. Anderson.

"A2." Copy of letter from John S. George, dated Ironton, January
14, 1858, addressed to Mrs. Fanny M. Hinckley, in which the writer
mentions previous letters and urges her to let him know what she
wants done in her case, which he warns her will be called up at the
ensuing March term.

"F." Document purporting to be the original answer to the above,
dated New York, February 20, 1858, in which Mrs. Hinckley acknowl-
edges the receipt of Mr. George's letter, and "ashores" him that his
other letters had not reached her, inquires as to the truth of certain
reports about McVey, and asks what Mr. George thinks about going on
with the case against him.

"A4, A5, A3, A1." Copies of letters from John S. George to Mrs.
Fanny M. Hinckley, dated February 26, May 5, June 2, and August 15,
1858, respectively, stating condition of case against McVey and urging
action of some kind.

Succession of Seymour.

· These efforts of her attorney, were, however, fruitless, and in September, 1858, the civil action against McVey was dismissed, as the criminal action had been dismissed the year before, at the cost of Mrs. Hinckley.

We have seen that the woman, whose succession is the subject of the present litigation, was one and the same as Fanny Maria Hinckley, who was divorced, by judgment of Judge Peabody of the Supreme Court of New York, December 15, 1856. The question then is, was that Fanny Maria Hinckley, one and the same as the Fanny Maria Hinckley who spent the summer of 1857 in Lawrence County, Ohio, and built a monument over the grave of her mother, Rebecca White, widow of John J. Brown?

The evidence to that effect, thus far recapitulated, has been circumstantial, but we think it would be sufficient, standing alone, to satisfy any reasonable mind, that she was the same woman.

Names are given to persons, as they are to animals, and to objects, to distinguish the one from the other, and unless they are very common, they serve the purpose fairly well. Of course, there might be two persons bearing the name "Fanny Maria Hinckley", and if that were shown to be the case, and it became necessary to distinguish them apart at a particular time or for a particular purpose, something other than the name would have to be resorted to:—thus as two persons can not occupy the same space at the same time, and as one person cannot be in two places at the same time, a particular time might be selected, and, if it was found that at that time, there was a Fanny at one place, and also a Fanny at another, and different, place, it would be conclusive that there were two Fannies; whereas, if it appeared that the two, supposed Fannies were actually occupying the same space, and figuring in the same identical role at one and the same time, it would be demonstrated that there was in reality but one.

In the case at bar, the Fanny who came to New Orleans in May, 1857, and the Fanny who, later in the same year, appeared in Ohio and built a monument to her mother, came from New York. The one called herself in New Orleans Fanny Minerva Seymour, divorced wife of Abraham Miller Hinckley; the other called herself, in Ohio, Mrs. Rachael Fanny Maria Hinckley, the divorced wife of a very bad husband named Hinckley, but each of them called herself "Fanny Maria Hinckley" in New York, where, in that name, the divorce was obtained. If, in the winter of 1856-7, there had been two divorces

granted, by the Supreme Court of New York, to two women, each call-ing herself Fanny Maria Hinckley, it could have been proved just as easily as the one divorce, so granted, was proved, but, as no such proof was made, it must be presumed that only one such divorce was granted and hence, that the Fanny Maria Hinckley calling herself "Fanny Minerva", in New Orleans, and "Rachael Fanny Maria", in Ohio, were one and the same. And this deduction is strengthened when—if we assume that they were one and the same, we consider that the "one" had been previously known, in New Orleans, as "Fanny Minerva", and in Ohio as "Rachael Fanny", and had, therefore, a reason for calling herself by a·different name in the two communities.

Again: the woman who came to New Orleans, by way of Havana, brought with her, along with the opinion and decree in the divorce case, two letters which she valued so highly that she preserved them until she died, nearly forty years later, the one written by C. A. Stet-son, and the other by R. M. Blatchford, both certifying to her char-acter. Later on, in the same year, a woman known to be Rachael Fanny Brown, but bearing the name of her in whose behalf the letters were written, became involved in a litigation in Ohio, which put her character at stake, and the attorney employed by her wrote for infor-mation upon the subject to C. A. Stetson and R. M. Blatchford. If we assume that there were two women, each calling herself Fanny Maria Hinckley, who had recently been divorced in New York, we must also assume that C. A. Stetson and R. M. Blatchford were·the friends of both of them. But, if those two persons happened, by a marvellous coincidence, each to be friendly to two women bearing the same name, and thus exceptionally and similarly situated, how is it that neither of them, in replying to Mr. George's somewhat unusual inquiries, asks him to which of the two his inquiries were directed. Still another circumstance which attracts attention is, that, years be-fore, in 1851 and 1852, the woman whose succession is before us, lived in Sacramento, California, as "Fanny Smith", and "Fanny Seymour", and was commonly understood, at that time, to be the sister of Leah Duell, who is shown, beyond peradventure, to have been Sarah Henri-etta, the sister of Rachael Fanny Brown, who, in 1857, visited her family in Ohio as Fanny Hinckley. It will be remembered that in 1851 and 1852, the name "Hinckley" had not been heard of, and whilst two abandoned women may call themselves sisters without being so, it would be remarkable if Leah Duell calling Fanny Smith her sister,

though she was not so, it should happen afterwards that Fanny Smith and a woman who was really the sister of Leah Duell should each marry, and be divorced at about the same time from, men named Hinckley, and not only so, but that they should each, without co-operation with, or knowledge of, the other, call herself Fanny Maria Hinckley, when the name of the one was Fanny Minerva and of the other Rachael Fanny.

In reaching the conclusions which have been stated, we have accepted as authentic, the documents found among the papers of Mr. George, as also the letters found in the bank box of the decedent, for the reason that all the testimony and the surrounding circumstances tend to show that they are authentic. Mr. George died in 1895, after having retired from active practice in 1888. He is shown to have been a prominent man and a methodical and painstaking lawyer, and we can conceive of no reason why he should have filed away, and preserved for thirty-eight years, documents which were spurious, or which told an untrue tale. The copies purporting to have been made by him are shown by unimpeached and uncontradicted evidence, to be in his handwriting. The letters purporting to be answers to those written by him to Messrs. Stetson and Blatchford, compare, as to handwriting and signature, with those found in the package left by the decedent and purporting to have been written and signed by the same persons, and their dates, the subject matter, and the place and circumstances of their finding, all point to their genuineness. The same thing may be said of the letters purporting to have been written by his client, and this much more, that witnesses, who were familiar with the handwriting of the decedent testified to their belief that the letters found among Mr. George's papers were written by her and bore her signature. And, finally, if these letters or any of them are not genuine, some effort, we imagine, would have been made to prove it. It is not suggested, however, that there were no such men in New York as C. A. Stetson and R. M. Blatchford, and we take it, from the evidence, that the one was the proprietor of the Astor House, and the other a prominent lawyer, and that witnesses familiar with their handwriting, and specimens of that handwriting, could easily have been found. And the same thing may be said of the letters of the decedent. But so far from attempting to show that the Hinckley letters found among Mr. George's papers were not genuine, the only evidence offered on that subject tends

to show that they were written by his client, and that his client and the decedent were one and the same.

In addition to this, there is a great deal of direct evidence identifying Rachael Fanny Brown with the deceased widow of William Reed Mills.

Witnesses have been examined who lived as neighbors to the Browns in Quaker Bottom, and went to school with them; who knew Rachael Fanny as a girl, at home, who afterwards knew her, in Ohio, as Fanny Maria Hinckley, and later still, in New Orleans, as Fanny Sweet, and Fanny Hinckley; and as the wife of Mills. Others have testified that they visited her house in New Orleans, time and again, with steamboatmen, whose names they give but who are now dead, who knew her at home, and who talked with her about old times and old acquaintances. Another knew her in Cincinnati and in California as the sister of Henrietta McCormack, and in New Orleans as Fanny Sweet and Fanny Hinckley. The Brown claimants have produced a picture, admitted to be a picture of the decedent, which, considering her apparent age, when it was taken, and the style of the picture itself, must have been taken before the civil war, and they have shown that it has been in the possession of Mrs. McVey since it was given to her by the original in 1857. Rosanna McVey Fuller has produced a pair of earrings which she testifies were given or sent to her by her aunt, and which, upon examination, under a strong glass, appear to be identical with those worn by the original in the picture. Jay R. Brown, the son of Charles Clinton Brown, produces a copy of Milton's poems which, it is shown, was sent to him by the decedent, and which bears upon the fly-leaf the following inscriptions, to-wit:

"Presented to my beloved wife Fanny."

"A. J. Sweet."

"Presented to my beloved nephew, Jay R. Brown."

"From your Aunt,"                    "Fanny Sweet."

"December 27th, 1882."

And we find no denial that the handwriting of December, 1882, is that of the decedent.

Upon the other hand, the theory that the decedent was an English girl, who came over on the "Waterloo", in June, 1846, has been, as we think, annihilated. The two witnesses, whose testimony is relied upon to support it, were boys in 1846, of eleven and sixteen years of age respectively. Mollere, who was born in 1835, when first examined, said

that he was a sailor and had shipped on the Waterloo at Liverpool, having run away from his home in Louisiana and reached that port in some way not explained. He testified that there was a young lady on board who told him that her name was Fanny Seymour, that she was going to New York on a pleasure trip and would return to London, "her native home", and that if he came to see her, she would show him the beautiful sights of the city; that he went to Mexico and, in 1849, to California, where he met her on the street, in San Francisco, and that he afterwards saw, and knew her, in New Orleans, as Fanny Sweet.

The other witness, Peale, testified that he came over on the "Waterloo' in June, 1846, being about sixteen years old (he was born in 1830), and that there was a passenger on board, a lively young girl, named Seymour, he thinks it might have been "Fanny" Seymour, "who was with a family, or some other parties", that after landing at New York, he went to Toronto, and was near there at school for a year or two, and then came to New Orleans, where he thereafter lived, but he knew nothing and heard nothing of the Seymour girl until 1868 or 1869 (about twenty-two or twenty-three years afterwards), though he says he saw Fanny Sweet in the meanwhile without associating her in his mind with the other. In 1868 or 1869 he was accustomed to drive to the lake, and fell into the habit of stopping at Fanny Sweet's, and, upon one occasion, in course of conversation, was told by her that she was the same girl with whom he had crossed the ocean in 1846. He says that, in order to recall herself to his memory, she mentioned, among other things, that a preacher named Murray, who was also a passenger, had been interfered with by some persons on board in an attempt to hold service, and that there was a disturbance.

Since the case was remanded, certified copies of the crew and passenger lists of the "Waterloo," for the only trips made by that ship in 1846, have been procured from the New York Custom House. The originals appear to have been prepared with great care, and verified by the affidavits of the captain, who accounted for everybody on board, those who came on after the ship had cleared as well as those who came on before, and neither the names "Mollere," "Peale," "Seymour," nor "Murray," nor any one of them appear on those lists.

Mollere subsequently undertook to explain this by saying that he shipped as a sailor "boy," and that he came on board after the ship had cleared. And Peale's statement is that he came on board with a

party who took the places of some other persons who had taken passage, but decided not to come. These are unfortunate coincidences, but we still do not see why their names should not have appeared in the crew and passenger lists, as did the names of others who took passage irregularly. It is also suggested that the girl's name did not appear because she came as the mistress of the captain. We venture to doubt whether any such thing was likely to have been done, on a vessel carrying respectable people as passengers between Liverpool and New York. The captain would, in so doing, have violated the law, the regulations of his owners, and the rules of common decency. Then we have the preacher, Murray, as to whom no explanation is offered, and we conclude, without going further, that the evidence is insufficient to justify the belief that the facts were as stated by these witnesses.

Fanny Sweet may, in conversation with Peale, have told him and may have convinced him, that she came over with him on the "Waterloo," having previously learned from him that he came over on that vessel; for she told a great many people that she was English, and that her name was Seymour. She told some persons that she was the daughter of an English admiral, others that she was born in Virginia; to one, she said that her aunt brought her from England and placed her in a boarding school; to another, that her parents died when she was young and that her guardian put her to work in a barroom, and that she was brought over by the captain of a ship (this is the story that she may have told Peale in 1868); to still another that her parents were unkind to her and that her governess brought her to this country and placed her with a family in Virginia who treated her badly, and that she ran away when she was about seven years old; and to still another, that she came to this country when she was ten, eleven, or twelve years old, etc. The only single thing that she was consistent about was in not telling that her name was Rachael Brown, and that she was a poor, uneducated girl from the banks of the Ohio river. Whether she had scruples about disgracing the name borne by her mother, or whether she thought that Fanny Minerva Seymour sounded better than Rachael Fanny Brown, is a question that she alone could answer. We are inclined to think, at all events, that in the case of a woman leading such a life as hers, the open and reiterated announcement of a name should rather be taken as an indication that the name so freely given is not her real name. It is said by one of the claim-

ants, Charles Clinton Brown, that his sister Rachael Fanny had some relations with a family of Seymours in Cincinnati, and the inference is suggested that she took the name from that circumstance. This may have been so ,but it is quite as likely that she adopted the name Fanny Minerva Seymour because she did not care to use the name Rachael Fanny Brown, and the other pleased her fancy.

The attempt to identify Sarah Henrietta and Rachael Fanny Brown with Ann, and Mary Stevens, has been entirely unsuccessful. Several witnesses for the State swore most positively and circumstantially that Sarah, who, as it is claimed, afterwards became Ann Stevens, was chambermaid on the steamboat "S. F. Vinton," as early as 1847. But it was conclusively shown that the "S. F. Vinton" was not built until 1850. The witnesses, some of them, then undertook to say that it might have been the "Swiss Boy" that she was employed on, whilst others still persisted in saying that she was on the "S. F. Vinton," at a time when the counsel for the State, himself, admits that the "S. F. Vinton" was not in existence.

Possibly Sarah may, at one time, have been employed as chambermaid on a steamboat, and her sister Rachael may, at the same time, have been employed as a servant at Guyandotte. If so, it was before the fall of the year 1846, and these circumstances fall far short of proving that the two women were the same as the Steven's sisters, who are said to have lived on Bank Alley, in Cincinnati, at the same time that Henrietta McCormack lived there and to have remained there several years after the latter went to California, where she died in 1872, leaving her estate to her brother, Charles Clinton Brown. All the witnesses say that the Stevens sisters, or at least Ann Stevens, and Henrietta McCormack were living in separate establishments on Bank Alley, but it is claimed, nevertheless, that Ann Stevens was Henrietta, or Sarah Henrietta McCormack, and that Henrietta McCormack, who lived next door was somebody else; whilst Mary Stevens, it is said, was not other than Rachael Fanny Brown.

The testimony in favor of this theory is weak and conflicting, and it would be a waste of time to anaylze it. The woman who married George Stevens, the gambler, from all the evidence, was called "Mary Jane." Her surname might have been Lewis or Shannon, or something else. We are satisfied that it was not Brown, and that she had no sort of connection with the woman whose identity and property is the subject of this litigation, and who, we think, it has been abund-

antly shown, was Rachael Fanny Brown, sister of Charles Clinton
Brown, and aunt of Rosanna McVey Fuller, the claimants before the
court.

For these reasons it is ordered, adjudged and decreed that the judg-
ment appealed from be affirmed.